Filed 5/7/13  Jeffrey v. Kleefeld CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| FRANCIS JEFFREY et al., | H036632 |
| Plaintiffs and Appellants, | (Monterey County Super. Ct. No. M99891) |
| v. | |
| CAROLYN MARY KLEEFELD et al., | |
| Defendants and Respondents. | |

Plaintiffs Francis Jeffrey and Janine Gonsenhauser challenge a judgment entered on an order granting defendants' motion for summary judgment.  Plaintiffs contend that triable issues of fact precluded summary judgment.  We conclude that the trial court erred in summarily adjudicating the fraud cause of action but did not err in summarily adjudicating the remaining causes of action.

## I.  Plaintiffs' Allegations

In July 2009, plaintiffs filed an action against defendants Carolyn Mary Kleefeld, Atoms Mirror Atoms, Inc. (Atoms), and 10 Doe defendants.[1]  Their amended complaint

_____

[1]     Defendants' demurrer to the original complaint was sustained with leave to amend.  The amended complaint included a defamation cause of action against Kleefeld and the Doe defendants alleging that they had defamed Jeffrey by referring to him as

alleged that "each Defendant . . . was, and is, sued as, the agent and employee of every other Defendant[] . . . ."

Plaintiffs alleged that a "business venture" was "formed in June, 1987" to develop Jeffrey's "computer programs and software designs . . . ." This "business venture" was allegedly a "joint venture" of Jeffrey and Kleefeld, and the two of them "had an understanding to share (50/50) profits and losses . . . ." From June 1987 to August 2008, Kleefeld allegedly "repeatedly promised and committed to fund the marketing of Jeffrey's patented technology to one or more companies." "Jeffrey, in consideration for such funding by Kleefeld, and as his end of the bargain, during such period promised to provide, and did provide, patented computer programs and software designs . . . ." "Three of the components of the business joint venture" were Elfnet, Inc., Alive Systems, Inc., and Pankosmion, Inc. Jeffrey allegedly relied on Kleefeld's promises. He also encouraged Kleefeld's art career and assisted her in managing her personal issues. By 1999, the "business venture" was allegedly "on the verge of financial success," but Kleefeld's financial support for the venture dwindled. As a result, Jeffrey's marketing efforts failed, and his patents "f[ell] into the public domain." By 2008, the venture's value had been "destroyed."

In September 2008, Kleefeld "caused Jeffrey to be hired" as an employee of Atoms. Jeffrey entered into a written employment agreement with Atoms that was also signed by Gonsenhauser. Barbara Simonich, the president of Atoms, signed the agreement on behalf of Atoms. The employment agreement, which was attached to the amended complaint, stated that Atoms "may terminate your employment at any time and for any reason whatsoever, including no reasons, with or without cause." It further stated that this provision "super[s]edes all prior written and oral communication with you and

---

"delusional" and "unreliable." Jeffrey does not challenge the superior court's summary adjudication of the defamation cause of action, so we do not address it.

2

can be modified only by written agreement signed by you and [Atoms]. In addition, [Atoms] has the right to take any personnel action (e.g. change of status, relocation, change of wages and benefits, etc.) at any time, for any reason, with our [*sic*] without cause, with or without notice." The agreement provided that Jeffrey would be paid $8,500 per month plus a $35,000 "signing bonus." Atoms would also "enroll you and all of your 'dependents' permitted under [Atoms's insurance] policies in [Atoms's] medical/dental/vision plans available through [Atoms's] insurance programs. Your enrollment and benefits shall be subject to all of the terms and conditions set forth in the applicable insurance policies." In return, Jeffrey was required to produce a monthly "report" on an assigned topic, though the length and content of the report was left to his "complete discretion." He and Gonsenhauser agreed to "maintain Ms. Kleefeld's privacy" and not to contact Kleefeld, communicate with her, or attempt to contact or communicate with her "in any manner, at any time, for any reason, directly or indirectly, except through [Simonich] or Thomas E. Mallet[t], legal counsel for [Atoms]." Jeffrey and Gonsenhauser also agreed to "keep confidential" the "relationship underlying this Agreement," and the fact and nature of the agreement. Jeffrey and Gonsenhauser understood the employment agreement to bind Atoms "to provide health insurance benefits" to Gonsenhauser. However, no such benefits were forthcoming even after their multiple "complaints" about the matter. In June 2009, Simonich, on behalf of Atoms, terminated Jeffrey's employment at Kleefeld's behest.

Based on these facts, Jeffrey and Gonsenhauser alleged a host of causes of action. Jeffrey alleged that Kleefeld was liable under the doctrine of promissory estoppel because she had promised "to fund the marketing of Jeffrey's technology." He alleged, as an "[a]lternative," that she breached a "joint venture contract" by failing to continue funding the venture. Jeffrey asserted that "Kleefeld was paid consideration in the form of a one-half interest in the joint venture and entitlement to one-half of any profits the joint venture may ultimately make." Jeffrey alleged that Atoms was liable for wrongful

3

termination in violation of public policy because he had been terminated for inquiring about Atoms's failure to provide health benefits to Gonsenhauser. He alleged that Atoms was liable for breach of the employment agreement due to its failure to provide health benefits to Gonsenhauser and its termination of Jeffrey's employment. Jeffrey alleged that Kleefeld and the Doe defendants were liable for intentional interference with prospective economic relations because they caused Atoms to terminate him.[2] Gonsenhauser alleged that Atoms was liable to her as a third party beneficiary for its breach of Jeffrey's employment agreement. Jeffrey and Gonsenhauser together alleged that Atoms was liable for fraud in the inducement for falsely representing that Gonsenhauser would receive health benefits if she and Jeffrey signed the employment agreement.

## II. Procedural Background

In April 2010, Kleefeld and Atoms filed a motion for summary judgment. This motion was originally scheduled to be heard on June 25, 2010. At a case management conference shortly after the filing of the summary judgment motion, plaintiffs complained that they "may need more time for discovery." With the hearing on the motion more than two months off at that point, the court told them "you've got a sufficient amount of time between now and then to complete discovery. And if you have difficulty, you can raise that through appropriate motions relating to the summary judgment." Plaintiffs continued to complain about discovery, and defendants' attorney noted that "a continuance of the summary judgment motion" was "not before this court"

---

[2] He also alleged a separate cause of action against only the Doe defendants asserting that they had interfered with his economic relationship with Kleefeld. However, that cause of action is not at issue here because only Kleefeld and Atoms obtained summary judgment.

4

at this hearing.  The court reiterated that plaintiffs would need to file a motion if they required a continuance.

Plaintiffs subsequently sought a continuance of the scheduled June 25, 2010 hearing on the summary judgment motion to August 17, 2010.  Defendants opposed the request.  The summary judgment hearing was continued to July 2010.  At the July 2010 hearing, the court noted that defendants' separate statement was poorly organized and failed to comply with California Rules of Court, rule 3.1350.  Although the court noted that it could deny the motion on that ground, it was not inclined to do so.  Nevertheless, the court's tentative ruling was to deny the motion because the court thought that there might be a triable issue on the promissory estoppel cause of action.  Defendants asked the court to allow them time to refile their motion in a proper form.  Plaintiffs expressly agreed on the record to the refiling of the motion on the condition that the trial date be put off.  Defendants agreed to put off the trial date.  The court then set a schedule for rebriefing of the motion, and the hearing on the rebriefed motion was scheduled for late October 2010.  Subsequently, at plaintiffs' request, the hearing was continued to December 2010.

Plaintiffs filed voluminous opposition to the motion, and they also filed written objections to the evidence supporting defendants' motion.  The evidentiary objections did not identify any legal objections to the admissibility of that evidence.[3]

At the December 3, 2010 hearing on the summary judgment motion, the court expressly overruled plaintiffs' objections to defendants' evidence.  The court granted defendants' motion and stated its findings orally on the record.  On December 17, 2010, the court entered an "ORDER GRANTING DEFENDANTS' MOTION FOR

---

[3]     One of their objections was that defendants' separate statement failed to comply with California Rules of Court, rule 3.1350.  Defendants' original separate statement was indeed out of compliance, but plaintiffs agreed that defendants could submit new pleadings.  Defendants' final separate statement substantially complied with the rule.

5

SUMMARY JUDGMENT . . . AND JUDGMENT." The written order and judgment also stated the court's findings on each cause of action.

On December 27, 2010, plaintiffs filed a motion for reconsideration of the court's ruling on the summary judgment motion. They submitted additional declarations in support of this motion. All of these declarations were from individuals who had previously submitted declarations in support of plaintiffs' opposition. Plaintiffs thereafter timely filed a notice of appeal from the trial court's judgment.

## III. Discussion

### A. Standard of Review

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) When the defendant moves for summary judgment, the defendant bears both the initial burden of production and the burden of persuasion. The "initial burden of production [requires the defendant] to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, at p. 851.) The burden of persuasion requires the defendant to show that there are no triable issues of material fact and that the defendant is entitled to judgment as a matter of law. (*Aguilar*, at p. 850.)

### B. Defendants' Evidence

Kleefeld and Atoms identified the following facts as undisputed facts in their separate statement and presented evidence in support of them.

Jeffrey "owned and controlled" Pankosmion, Elfnet, and Alive Systems. Kleefeld gave $100,000 to Alive Systems in 1990 and made a series of 17 loans to Elfnet between 1991 and 2000. Her loans to Elfnet totaled $4,569,500. Jeffrey was the president of Elfnet. The loans to Elfnet were interest bearing loans that could be converted to stock ownership. Kleefeld sought, as a "condition of the loans" to Elfnet that Jeffrey give her half of any income derived from his technology. None of the loans was ever repaid. In 2000, Kleefeld informed Jeffrey that she would be making no further loans to Elfnet. Kleefeld did not enter into any joint venture contract with Jeffrey. She gave Jeffrey $100,000 in 2005 because he was destitute, and she felt sorry for him. Kleefeld never gave Jeffrey any additional funds after 2005.

Kleefeld was the sole shareholder of Atoms, and she had the sole power to make employment decisions for Atoms. It was her decision to hire Jeffrey and to terminate him. She decided to have Atoms hire Jeffrey because she wanted to help him and also to "be assured that he and Ms. Gosenhauser [*sic*] would not harass me again" as they had previously. In order to serve this purpose, the employment agreement prohibited Jeffrey and Gonsenhauser from communicating with her. However, once Jeffrey became employed by Atoms, Kleefeld began "receiving bills from both my accountant [Simonich] and my attorney [Mallett] evidencing ongoing contact with Mr. Jeffrey." "These bills indicated to me that my attempted charity to Jeffrey through his employment was ineffective, he was dissatisfied with the situation, and had no gratitude." She concluded that "it was not in anyone's interest to continue this situation," so, "[p]ursuant to my instructions, Atoms, Inc. terminated" Jeffrey's employment. Kleefeld was unaware, prior to the termination of Jeffrey's employment, that Jeffrey had complained about Atoms's failure to provide health benefits for Gonsenhauser during his employment.

Mallett is legal counsel to both Kleefeld and Atoms. When he presented Kleefeld's offer of employment to Jeffrey, Jeffrey said that the salary was "insufficient"

7

even though Mallett explained that "he really had no duties under the employment agreement." Mallett also explained that Gonsenhauser's signature on the agreement was required because Kleefeld wanted assurance that Gonsenhauser would not contact or harass her in the future.

Simonich is president of Atoms and Kleefeld's personal accountant. Before Jeffrey and Gonsenhauser signed the employment agreement, Simonich told them that "Gonsenhauser would be covered if she qualified as a dependent under the coverage in effect at Atoms, Inc." Atoms's health insurance was provided by Anthem Blue Cross. Jeffrey filled out and signed an Anthem Blue Cross application for health benefits. On the application, he identified Gonsenhauser as his dependent and his domestic partner. The form explicitly defined "[e]ligible dependent" as "lawful spouse or domestic partner" and sought the date of the "Domestic Partnership Declaration." Jeffrey did not enter such a date. Gonsenhauser is not Jeffrey's spouse, and she has never been or made any effort to become Jeffrey's domestic partner. Atoms submitted Jeffrey's application to Anthem Blue Cross, but Anthem Blue Cross informed Atoms it required the domestic partner registration number "in order to extend coverage to her." On October 28, 2008, Atoms sent a letter to Jeffrey notifying him that Anthem Blue Cross required the domestic partner registration number and requesting that he provide this information to Anthem Blue Cross. Atoms's letter stated that "[w]ithout this information she is not going to be considered for this insurance plan." Because Jeffrey did not provide the requisite information, Atoms was unable to provide health insurance coverage to Gonsenhauser.

During Jeffrey's employment by Atoms, he repeatedly contacted Simonich. Jeffrey also contacted Mallett about the health benefits issue. Simonich did not communicate to Kleefeld the contents of Jeffrey's communications. Kleefeld learned only that Jeffrey was "costing me money" by "constantly" contacting Simonich and Mallett. At Kleefeld's instructions, Simonich terminated Jeffrey's employment.

8

### C. Plaintiffs' Response

Plaintiffs admitted that many of defendants' material facts were undisputed, but they challenged some of them. They did not dispute that the funds Kleefeld had given to Elfnet were loans that were convertible to stock, that no more loans had been made after 2000, and that these loans had not been repaid. Plaintiffs did not dispute that Kleefeld was the sole shareholder of Atoms and that Jeffrey was hired and terminated by Atoms at her instigation. They did not dispute that they had read and signed the employment agreement with Atoms. They did not dispute that Anthem Blue Cross required a domestic partner registration number in order to extend health benefits coverage to Gonsenhauser, and that Gonsenhauser had never taken any steps to register as Jeffrey's domestic partner. Nor did they dispute that Jeffrey had complained to Simonich.

They disputed whether Kleefeld had the sole power to make employment decisions for Atoms, but cited no evidence to the contrary. They also disputed whether Kleefeld had knowledge of Jeffrey's communications with Mallett and Simonich, but they produced no evidence that she did and merely claimed that she had "constructive knowledge." Although they admitted that Gonsenhauser was not Jeffrey's registered domestic partner, they disputed the meaning of the terms "dependent" and "domestic partner." Plaintiffs disputed whether the employment agreement was integrated and whether Jeffrey's employment was "at will." They also contended there was a dispute about the terms of the employment agreement regarding health benefits. Finally, plaintiffs claimed that Jeffrey had responded to the October 28, 2008 letter by speaking to Simonich and Mallett on the telephone.


### D. Miscellaneous Issues

Plaintiffs' appellate briefing individually challenges the superior court's rulings on each cause of action. At various points in their briefs, plaintiffs make other general complaints, which they do not clearly delineate as separate contentions.

They complain that defendants' pleadings in the superior court did not comply with California Rules of Court, rule 3.1350 and Code of Civil Procedure section 437c and fault the superior court for failing to rule individually on each of their evidentiary objections. Plaintiffs also suggest that the superior court erred in allowing defendants to rebrief their motion. Since the lack of rule compliance was cured by the rebriefing to which plaintiffs explicitly agreed, the rebriefing substantially complied with the statute, and the purported evidentiary objections lacked merit, these contentions are unavailing.

Plaintiffs seem to complain that defendants did not fully comply with their discovery requests, but we can find no motion to compel or ruling thereon in the appellate record. Therefore, this contention was not preserved for appellate review.

Plaintiffs also suggest that the superior court did not make adequate findings in its order granting summary judgment. Both at the hearing and in its written order, the superior court made specific findings regarding each cause of action. These findings were adequate. There are intimations in plaintiffs' briefs that the superior court should have granted a "new trial" motion. The record does not appear to contain any ruling on a new trial motion or on plaintiffs' postjudgment reconsideration motion, so there is no ruling for us to review.

Furthermore, "[t]o the extent [appellant] perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.) Because plaintiffs' general complaints are not clearly delineated as separate contentions and are not developed, they are not properly made, and we deem them forfeited. We proceed to consider plaintiffs' challenges to the superior court's rulings on their causes of action.

### E. Promissory Estoppel

The superior court found that Jeffrey's promissory estoppel cause of action lacked merit because "the undisputed facts establish consideration was given." "[A] plaintiff cannot state a claim for promissory estoppel when the promise was given in return for proper consideration. The claim instead must be pleaded as one for breach of the bargained-for contract." (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 275.) "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." (Civ. Code, § 1605.)

Although defendants sought summary adjudication of this cause of action on the ground that "consideration was given," defendants' separate statement did not clearly address the lack of consideration issue. However, this inadequacy is immaterial because, as defendants pointed out in their pleadings below, the verified amended complaint itself alleged that consideration was given, and Jeffrey *admitted* at his deposition that the alleged promise was made in exchange for consideration. Jeffrey alleged in his *verified* amended complaint that Kleefeld had promised in 1987 to fund the development of his "patented technology," and that "Jeffrey, *in consideration for such funding* by Kleefeld, and *as his end of the bargain*, . . . promised to provide, and did provide, *patented* computer programs and software designs . . . ." (Italics added.) Thus, Jeffrey's verified pleading took the position that Kleefeld's promise was given *in exchange for his* provision of the patented technology. Where a summary judgment motion essentially challenges the sufficiency of the allegations to state a cause of action and does not require the consideration of evidence, the motion may be treated as a motion for judgment on the pleadings and leave to amend granted if appropriate. (*Taylor v. Lockheed Martin Corp.* (2000) 78 Cal.App.4th 472, 479) Here, this cause of action was subject to judgment on

11

the pleadings on the ground that it failed to state a cause of action.  And it was inconceivable that Jeffrey could have amended the verified complaint because he testified at his deposition that "what [Kleefeld] was getting back for the promise" she made in 1987 was that "she was to get . . . approximately 50 percent ownership" of the technology.  Since Jeffrey was bound by these admissions, he could not establish that Kleefeld's alleged 1987 funding promise was made without consideration.  It follows that her alleged promise could not form the basis for a promissory estoppel cause of action.

### F.  Breach of Joint Venture Contract

The superior court found that Jeffrey's breach of joint venture contract cause of action could not succeed because "the undisputed facts establish that no joint venture was created" since "[t]he written agreements were loans," and Kleefeld had "no intent" to "enter into a joint venture."  It was undisputed that each and every one of Kleefeld's loans to Elfnet was documented in a writing, signed by Jeffrey, specifying that the funds were an interest bearing loan that could be converted to stock ownership.  This explicit characterization of the funds Kleefeld provided precluded any inference that the funds were provided pursuant to an unwritten joint venture agreement.  Kleefeld also explicitly denied that she had ever entered into a joint venture contract with Jeffrey.  Jeffrey did not respond with any evidence to support his allegation that he and Kleefeld had entered into a joint venture contract.  Defendants were therefore entitled to summary adjudication of this cause of action.

### G.  Wrongful Termination in Violation of Public Policy

The superior court found that this cause of action lacked merit because "there was no violation of public policy."  Jeffrey claimed that the "public policy" was related to Gonsenhauser's allegedly promised but undelivered health benefits.  He maintains that he was terminated because he complained about this breach.  However, defendants produced

12

undisputed evidence that Kleefeld was unaware of the nature of his complaints and instigated his termination because his communications with her accountant and attorney were costing her money.  Jeffrey produced no evidence to the contrary.  He merely claimed that Kleefeld had "constructive knowledge."  Yet her actual lack of knowledge precluded any connection between the nature of Jeffrey's complaints and her decision to terminate him.  The superior court did not err in summarily adjudicating this cause of action.

### H.  Breach of Employment Contract

The superior court found that this cause of action lacked merit because Jeffrey "was an at will employee who could be terminated at any time for any reason."  The written employment agreement, which was fully integrated, explicitly stated that Jeffrey's employment was at will.  Although he claims there were oral representations to the contrary, parol evidence is not admissible to alter the provisions of an unambiguous fully integrated writing.  (*Haggard v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App.4th 508, 519-520.)  The employment agreement's "at will" provisions were not reasonably susceptible of Jeffrey's proposed construction that his employment was "to continue in perpetuity."  Hence, the superior court did not err in summarily adjudicating this cause of action.

### I.  Interference

The court found that this cause of action lacked merit because Kleefeld was acting as Atoms's agent and therefore could not be liable for interference.  "The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance."  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.)  Plaintiffs claim that Kleefeld was not Atoms's agent, but they alleged as much in their verified complaint.  Furthermore,

13

they produced no evidence disputing that Kleefeld was the sole shareholder in Atoms and that she exercised full control over Atoms's employment decisions. There was no error.

## J. Third Party Beneficiary Breach of Contract

The court found that this cause of action lacked merit because there was no breach of contract. Gonsenhauser claims that the employment agreement was ambiguous with respect to the provision of health benefits. The employment agreement stated that health benefits would be provided to "'dependents' *permitted under [Atoms's insurance] policies*" and "subject to all of the terms and conditions set forth in the applicable insurance policies." (Italics added.) It was undisputed that the terms of Atoms's health insurance policy did not cover Gonsenhauser unless she was Jeffrey's spouse or registered domestic partner. She admitted that she was not. Thus, the contract was not violated when she received no health benefits. Again, parol evidence was inadmissible to contradict the unambiguous terms of the integrated written contract.

## K. Fraud

The trial court found that the fraud cause of action lacked merit because "there is no triable issue of fact that a misrepresentation was made." Jeffrey and Gonsenhauser claim that there is a triable issue of fact because they produced evidence that Simonich told them that Gonsenhauser would receive health benefits as a result of the employment contract.

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Atoms produced evidence that Simonich told Jeffrey and Gonsenhauser that, if they signed the employment agreement, "Gonsenhauser would be covered *if she qualified*

14

*as a dependent* under the coverage then in effect at Atoms, Inc." (Italics added.) The undisputed facts established that Gonsenhauser did *not* qualify as a dependent under Atoms's insurance policy. However, Jeffrey and Gonsenhauser submitted their declarations in which they asserted that, before signing the agreement, they asked Simonich if Gonsenhauser "would defin[i]tely receive the health care benefits." They declared that Simonich replied "Yes, you [Gonsenhauser] will receive them." Hence, there was a factual dispute about whether Simonich had made a misrepresentation.

Although Atoms claims on appeal that evidence of Simonich's alleged misrepresentation was precluded by the parol evidence rule, the case upon which they rely, *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, was recently overruled by the California Supreme Court. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 169.) As Atoms did not seek summary adjudication of this cause of action on any other ground, we must conclude that the trial court erred in summarily adjudicating it.


## IV.  Disposition

The judgment is reversed, and the matter is remanded with directions to vacate the order granting summary judgment. The superior court is directed to enter a new order granting summary adjudication as to all of the causes of action other than the fraud cause of action and denying the motion as to the fraud cause of action. The parties shall bear their own costs on appeal.

15

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.



_____
Márquez, J.